## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ROBIN LITAKER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:14-cv-02176-MHH** |
| | } | |
| **HOOVER BOARD OF** | } | |
| **EDUCATION, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Robin Litaker worked for the Hoover Board of Education for 21 years. The Hoover Board selected Ms. Litaker as the principal of Trace Crossings Elementary School in 2010. Ms. Litaker received favorable ratings for her first two years at Trace Crossings, and the Board gave her a three-year contract in June 2012. Five months later, former Hoover Superintendent Andy Craig transferred Ms. Litaker from her position as the principal at Trace Crossings to the Board's Central Office. Mr. Craig did not give Ms. Litaker a formal Central Office position, and he did not offer her a position as principal at another school in the district. Instead, after giving her odd jobs in the Central Office, Mr. Craig had his assistant superintendent, Dr. Ron Dodson, inform Ms. Litaker that she would have to serve as the assistant principal at the district's alternative school. Ms. Litaker

was not qualified for that position. Ms. Litaker refused the assistant principal position, and she resigned.

After her resignation, Ms. Litaker sued the Board, Mr. Craig, and former Assistant Superintendent Carol Barber. Ms. Litaker contends that the Board and Mr. Craig discriminated against her because of her gender in violation of Title VII of the Civil Rights Act of 1964 and that the Board, Mr. Craig, and Ms. Barber violated her Fourteenth Amendment due process rights. In addition to these federal claims, Ms. Litaker asserts state law claims for breach of contract and defamation. Pursuant to Federal Rule of Civil Procedure 56, the defendants have asked the Court to enter judgment in their favor on all of Ms. Litaker's claims. (Doc. 19; Doc. 20). For the reasons stated below, the Court grants in part and denies in part the defendants' motions.

## I. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). When considering a summary judgment motion, the Court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *White v. Beltram Edge Tool Supply, Inc*., 789 F.3d 1188, 1191 (11th Cir. 2015).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Ms. Litaker began her 21-year career with the Hoover city school system in 1992 as a teacher at Trace Crossings Elementary School. (Doc. 21-1, p. 5). In 1998, while teaching at Trace Crossings, she was honored as Alabama's State Teacher of the Year. (Doc. 27-1, ¶ 3). Ms. Litaker worked at other Hoover schools as a teacher and assistant principal before returning to Trace Crossings as the principal in 2010. (Doc. 21-1, p. 5; Doc. 21-4, p. 7). When the Board selected Ms. Litaker to serve as the principal at Trace Crossings, she and former Superintendent Andy Craig, on behalf of the Board, entered a two year probationary contract. (Doc. 21-1, pp. 42, 111-115; Doc. 21-4, p. 10). Ms. Litaker received positive evaluations during her first two years at Trace Crossings. (Doc. 21-2, pp. 101-108).

When Ms. Litaker arrived at Trace Crossings in 2010, she reported to Mr. Craig and Assistant Superintendent Carol Barber, who oversaw elementary and

middle school principals. Mr. Craig and Ms. Barber told Ms. Litaker that Trace Crossings "had multiple, serious issues and a toxic working environment." (Doc. 27-1, ¶ 7). According to Ms. Litaker, the problems were both instructional and administrative. (Doc. 27-1, ¶¶ 7-9). A third-party audit indicated that the school had "instructional, achievement and diversity issues." (Doc. 27-1, ¶ 7). The audit stated that Trace Crossings teachers were not using the state-mandated curriculum or board-approved instructional materials. (Doc. 27-8, pp. 19-20). Other problems included failure to properly observe teachers and follow state protocol with respect to keeping standardized tests in secure locations. (Doc. 27-1, ¶ 8). In addition, some teachers were charging students for tutoring sessions against Board policy; some teachers skipped units of study or did not turn in lesson plans; other teachers did not receive training for the school's math, reading, and science curriculum; and most teachers did not receive appropriate professional development. (Doc. 27-1, ¶ 8). Ms. Litaker testified that "[she] was told to go into the school and fix these things." (Doc. 21-1, p. 18).

Some teachers at Trace Crossings were upset when Ms. Litaker became principal because she held the teachers "accountable to the same standards" as other Hoover teachers with respect to turning in lesson plans and teaching to a written curriculum. (Doc. 21-1, pp. 17-18). According to Ms. Litaker, Trace Crossings's assistant principal, Dr. Debra Smith, made her (Ms. Litaker's) first

year at Trace Crossings very difficult. Dr. Smith had applied for the principal position that Ms. Litaker received. (Doc. 21-6, p. 18). Dr. Smith told teachers not to listen to Ms. Litaker. (Doc. 21-1, pp. 9-11; Doc. 27-1, ¶ 11). After Ms. Litaker discussed the situation with Mr. Craig and Ms. Barber, Ms. Barber stated that "they intended to 'chase [Dr. Smith] off' by sending her to Crossroads Alternative" school. (Doc. 27-1, ¶ 12).

Despite these challenges, Ms. Litaker received a positive evaluation at the end of her first year as Trace Crossings's principal. (Doc. 21-1, p. 116). In the review dated January 13, 2011, Ms. Barber gave Ms. Litaker 3 out of 4 or 4 out of 4 in every area on the review form. (Doc. 21-1, pp. 116-119). Ms. Barber gave Ms. Litaker the highest possible score for "collaboration processes and skills." Her review states:

> As a first year principal, inherited a faculty/staff where culture, climate, and practices had to change. Began process of change by meeting with people—individually, in small groups, and in larger groups. Listened to people. Identified areas where she would not allow any negotiations; identified areas where input was needed and encouraged. Planned transition activities to gain teacher and parent support. Established expectations and standards, yet building support and gaining teacher buy-in to new expectations and practices. Works hard to build on existing teacher strengths; acknowledges these strengths and delegates and empowers those to act. [Assistant Principal], currently in the school, applied for the principal position and was most upset w[hen] this did not occur. Filed an EEOC [charge]; district prevailed in the hiring of Ms. Litaker. Principal continues to work with this AP even though there appears to be a great deal of negative behavior involved. This skill area is an area of strength for Ms. Litaker.

(Doc. 21-1, p. 116). Ms. Litaker also received the highest possible score for "planning." Her review states:

> Principal is developing ownership of new ideas as they evolve. Principal encourages input into decisions for the school[]. Principal is strategically planning for change, moving slowing and trying to take faculty and pa[r]ents with her as changes are implemented. Principal is establishing goals and identifying activities to support school goals. Input for change is encouraged from faculty/staff, students, and parents. Principal is using data from a variety of sources to establish goals and objectives (assessment data, survey data, parent and staff meetings, etc.).

(Doc. 21-1, p. 117). In addition, Ms. Litaker received the highest possible score for "problem solving." With respect to this category, Ms. Litaker's evaluation states:

> Principal develops ownership of ideas by delegating, empowering others, and sharing. Input into solving problems is encouraged and acknowledged. Principal labels problems; brainstorms solutions with individuals/groups involved; develops ownership of solutions by allowing input into the solutions; shares data to help direct solutions; and builds consensus regarding the best solution for the problem. Principal has emphasized assessment data with faculty; helping teachers to understand profiles and to plan strategically for improvement.

(Doc. 21-1, p. 117). Ms. Barber also gave Ms. Litaker the highest score for "school operations and management." Ms. Litaker's evaluation states:

> Principal is analytical in assessment of building practices and procedures. This is an area of strength for Ms. Litaker. She understands how to effectively schedule personnel to achieve maximum efficiency; establishes routines to benefit students and faculty; and establishes rapport with student[s] by creating a safe and

secure learning environment (physically safe and emotionally safe)! Principal uses a critical eye to determine appearance of building and grounds and holds staff accountable for expressed expectations. Principal establishes high expectations and is willing to work with personnel as they change practices to meet changed expectations; however, will hold people accountable for agreed upon standards.

(Doc. 21-1, p. 118). In the 2011 review, Ms. Barber stated that Ms. Litaker "constantly references mission and vision for [Trace Crossings] and expects teachers to use this as a screen for making decisions." (Doc. 21-1, p. 119).

Ms. Litaker asserts that in her second year at Trace Crossings, things were much improved: "the faculty was working together much better, many of the instructional issues has been solved, and the school had a pleasant environment that was conducive to learning." (Doc. 27-1, ¶ 13). In addition, during her second year, the school's test scores increased, and although some teachers remained loyal to Dr. Smith, according to Ms. Litaker, "the toxic environment and morale issues were gone." (Doc. 27-1, ¶ 14).

Ms. Litaker's annual review for her second year as principal of Trace Crossings is consistent with Ms. Litaker's assessment. (Doc. 21-1, pp. 120-123). In the February 8, 2012 review, Ms. Barber again gave Ms. Litaker the highest possible score in the areas of collaboration processes and skills, planning, and school operations and management. (Doc. 21-1, pp. 120-123). With respect to "organizing for results," Mr. Barber wrote:

Principal is in 2nd year of principalship; has undertaken major shift in school culture; has created a new vision for school; holds people accountable for practices to support vision/mission. Principal has created additional planning opportunities for teachers, based upon results of survey data from teachers. Principal reviews survey data and responds with adjustments to organizational practices when possible. School has participate[d] in a Total Quality Review Analysis and is using results from this process to design school improvement practices.

(Doc. 21-1, p. 120). With respect to "innovation," Ms. Barber reported:

Principal is insightful in her vision for school and how to achieve the vision. School has embraced a[] teaming model for school operations. Common core curriculum has been rolled out early. Teachers are expected to share common practices for differentiation, assessment, etc. Principal has set the bar high for teacher expectations; is insistent that teachers also have opportunities to learn new practices. Mechanism to support and help teachers achieve outcomes are constantly being provided and evaluated.

(Doc. 21-1, p. 121). With respect to "fiscal leadership and management," Ms.

Barber stated:

Reviews were conducted by the District Internal Auditor and the District Accounting Manager for the period from October 1, 2010 through May 31, 2011. No exceptions were noted. Ms. Litaker and Mrs. Drake, bookkeeper for [Trace Crossings], are to be commended for the significant improvement in fiscal responsibility that has occurred at [Trace Crossing] over the past two year[s].

(Doc. 21-1, p. 122). Ms. Barber gave Ms. Litaker 3 out of 4 in the area of

"management of professional responsibilities." (Doc. 21-1, p. 122). With respect

to this portion of the evaluation, Ms. Barber stated that:

Principal is punctual to work; has a phenomenal work ethic; submits reports and paperwork in a timely manner. Principal models

professionalism when dealing with teachers, students, and parents. Principal is willing to hold people accountable even if it means she may experience some level of discomfort from staff/parents. Principal will tackle tough situations if it is in the best interests of students!

(Doc. 21-1, p. 122).

Based on Ms. Litaker's performance during the two-year probationary period, in the summer of 2012, Mr. Craig offered, and Ms. Litaker accepted, a three-year principal's contract. The Board approved the contract on June 18, 2012, and the contract became effective July 1, 2012. (Doc. 21-1, pp. 44, 124-129; Doc. 21-2, p. 6; Doc. 21-4, pp. 10, 12).

Ms. Litaker's principal contract provides in relevant part:

. . .

**Section 5.   Transfer.**  The Board, upon the written recommendation of the Superintendent, is authorized to transfer the Contract Principal without loss of salary to any other administrative position in the school system.

. . .

**Section 8.   Evaluation.**  The Contract Principal shall be evaluated annually according to the process defined by the State Board of Education.   The Contract Principal agrees to participate in the evaluation process and to complete any professional development plan resulting from the evaluation process.   The failure of the Superintendent to ensure the Contract Principal is evaluated shall result in a one-year extension of this contract, for no more than a total of three years.

. . .

**Section 12.  Amendment, Modification, or Waiver.**  This Contract shall not be amended, modified, or waived except in writing authorized, agreed upon, and executed by the Contract Principal and

the Board, upon the written recommendation of the Superintendent.

(Doc. 21-1, pp. 125, 127).

On July 3, 2012, Ms. Litaker received an email regarding the previous school year's test scores, and she knew that Trace Crossings would not make AYP. (Doc. 27-1, ¶¶ 18, 22). AYP is an acronym for adequate yearly progress. (Doc. 21-4, p. 11). Ms. Litaker immediately notified Mr. Craig of the test scores. (Doc. 27-1, ¶ 18). Because the test results showed unusually low math scores for fourth grade students, Ms. Litaker suspected that a testing infraction may have caused the problem. (Doc. 27-1, ¶¶ 18, 20). According to Ms. Litaker, student achievement did not match the testing data, and teachers received several sets of directions before giving the math portion of the test. (Doc. 27-1, ¶ 19).[1] Mr. Craig appointed Dr. Deborah Camp to investigate and report to the State Department of Education information about the suspected testing infraction. (Doc. 27-1, ¶ 20). Dr. Camp was the district's Director of Elementary Curriculum Instruction. (Doc. 27-8, p. 5).[2]

Ms. Litaker requested a meeting with Mr. Craig, Dr. Camp, Assistant Superintendent of Instruction Dr. Ron Dodson, and Ms. Barber to discuss a plan to address the low test scores. (Doc. 27-1, ¶¶ 20-21). Ms. Litaker proposed

---

[1] In 2011, Dr. Smith moved from Trace Crossings to an administrative position in the Central Office where she handled the school district's testing. (Doc. 21-6, pp. 14, 28). Dr. Smith was involved in providing directions for the math tests. (Doc. 27-1, ¶ 19).

[2] In 2012, the position title changed to Director of Curriculum and Instruction. (Doc. 27-8, p. 5).

additional training for kindergarten, first, and second grade math teachers. (Doc. 27-1, ¶ 22). Ms. Litaker requested, and the Board approved, additional funding for this professional development. (Doc. 27-1, ¶ 24). Ms. Litaker also asked Central Office administrators to help conduct walkthroughs in math classrooms to observe teachers and identify struggling students. (Doc. 27-1, ¶ 23).

Three Hoover schools did not make AYP for the 2011-2012 school year: Berry Middle, Brock's Gap Intermediate, and Trace Crossings. By the end of the 2012-2013 school year, Ms. Litaker no longer was at Trace Crossings, and the Board transferred Berry's female principal to the principal position at Greystone Elementary. The male principal at Brock's Gap remained in his position. (Doc. 27-1, ¶ 26). Ms. Litaker testified that for the 2010-2011 school year, three schools with male principals—Hoover High, Hoover Freshman Campus, and Simmons Middle School—did not make AYP; each male principal remained in his position for the 2011-2012 school year. (Doc. 27-1, ¶ 26).[3]

As Ms. Litaker began her efforts to address AYP at Trace Crossings, Mr. Craig contends that he received reports from Ms. Barber and Mary Veal, the Hoover school district's Director of Human Resources, about an "increasing number" of issues at Trace Crossings. (Doc. 21-4, p. 12). Ms. Veal reported to Mr. Craig a number of complaints from Trace Crossings teachers "about the

_____

[3] The record does not indicate whether other schools in the Hoover district fell short of AYP for the 2010-2011 school year.

leadership of the school, things being managed in regards to student discipline . . . [and] low morale." (Doc. 21-6, p. 9). Ms. Veal testified that "there appeared to be a lack of trust, and people were concerned about going to Ms. Litaker." (Doc. 21-6, p. 9). Ms. Veal also reported complaints about teachers being asked to work outside of their contract hours. (Doc. 21-4, p. 25). Ms. Litaker states that no one informed her of these complaints until the depositions that took place as part of this case in 2015. (Doc. 27-1, ¶¶ 10, 30).[4]

According to Ms. Barber, when she visited Trace Crossings in the fall of 2012, she observed "a distinct coldness in the building. . . . [T]eachers weren't talking to one another. . . . [T]here was no collaboration. . . . Teachers weren't working together as they should in an elementary school." (Doc. 21-2, p. 8). Ms. Barber sensed that Ms. Litaker was overwhelmed and that the situation was not improving. (Doc. 21-2, p. 24). Although Ms. Barber reported these concerns in her deposition in July of 2015, neither she nor Mr. Craig disciplined Ms. Litaker in 2012, and they did not provide her with a written performance improvement plan or inform her that the problems at Trace Crossings could lead to her removal from

---

[4] According to Ms. Litaker, some of the individuals who, according to Ms. Veal, complained about Ms. Litaker were the same individuals who had tried to undermine her when she began as principal at Trace Crossings. (Doc. 27-1, ¶ 10). With respect to the complaints about teachers working outside contract hours, Ms. Litaker testified that "no teacher or staff ever work[ed] outside of their contract when they were not paid a supplement out of the supplement money that elementary principals use for programs that directly involve children. During my time as Principal, these supplements were used for intervention and teachers were paid beyond their contract hours to voluntarily assist with morning programs for at-risk students." (Doc. 27-1, ¶ 33).

the school. (Doc. 21-2, p. 23; Doc. 21-5, ¶ 3; Doc. 27-1, ¶ 34).

Ms. Barber's visits were part of the walkthroughs of math classrooms that Ms. Litaker had requested. Ms. Litaker and Dr. Dodson conducted walkthroughs of the second grade classrooms. (Doc. 27-1, ¶ 30). Ms. Barber and Amanda Stone, the assistant principal at Trace Crossings for the 2012-2013 school year, did walkthroughs for the third grade classrooms. (Doc. 27-1, ¶ 30). Dr. Camp and Linda Gurosky, a district administrator who oversaw federal programs like Title I, performed walkthroughs in the fourth grade classrooms. (Doc. 27-1, ¶¶ 30, 45). According to Ms. Litaker, the second and fourth grade walkthroughs went well, but the third grade walkthroughs did not. (Doc. 27-1, ¶ 31). After one of Ms. Barber and Ms. Stone's walkthroughs in a third grade classroom, a third grade teacher came to Ms. Litaker's office in tears because Ms. Barber and Assistant Principal Stone had verbally attacked the teacher. (Doc. 27-1, ¶ 31).[5] As a result, Ms. Litaker asked to suspend the walkthroughs by administration and proposed to have teachers conduct walkthroughs. (Doc. 27-1, ¶ 32). Ms. Barber and Dr. Dodson disagreed but stopped conducting walkthroughs after Ms. Litaker was removed from Trace Crossings. (Doc. 27-1, ¶ 32).

In November 2012—less than six months after Mr. Craig and Ms. Litaker executed a principal contract and after giving Ms. Litaker only three months to

---

[5] Ms. Litaker reported that Ms. Barber was also pressuring her to fire the only male African-American teacher at the school. (Doc. 27-1, ¶ 31).

implement efforts to address low math test scores—Mr. Craig decided to remove Ms. Litaker from the principal position at Trace Crossings. Mr. Craig states that he made the decision because he was concerned about "the direction of the school." (Doc. 21-4, p. 22). Mr. Craig discussed his decision with Ms. Barber. (Doc. 21-4, p. 22). Mr. Craig decided that Ms. Barber would replace Ms. Litaker because Ms. Barber's "extensive principalship experience" would give the school the best opportunity to restore unity among the faculty, staff, and parents. (Doc. 21-4, p. 23).

On November 15, 2012, Ms. Barber called Ms. Litaker and asked her to stop by the Central Office. Ms. Litaker arrived at the Central Office some time after 4:00 p.m. and found Ms. Barber in her office. (Doc. 21-1, p. 7). Ms. Barber told Ms. Litaker that Trace Crossings teachers were complaining to Ms. Veal and that good teachers were planning to leave Trace Crossings. (Doc. 21-1, pp. 7-9). Mr. Craig joined the meeting as Ms. Barber made these remarks. Ms. Litaker explained that she was "totally taken off guard" by the remarks because she "had never been talked to, reprimanded, written up about anything related to my faculty." (Doc. 27-1, p. 7). Ms. Litaker disagreed with Ms. Barber's remarks; she stated that teachers were not planning to leave. (Doc. 21-1, p. 7). Mr. Craig then commented, "Well, I just -- I think it is time for a change." (Doc. 21-1, p. 8). Mr. Craig told Ms. Litaker that certain individuals were "after" her, including Dr.

Smith and a Board member. (Doc. 21-1, pp. 8, 11-12). Ms. Barber told Ms. Litaker that those individuals "can't hurt me. I am going to retire. I can get in there and finish, you know, cleaning it up." (Doc. 21-1, p. 8). Mr. Craig and Ms. Barber told Ms. Litaker that they were moving Ms. Litaker to "protect [her]." (Doc. 21-1, p. 51). Mr. Craig did not recommend the transfer to the Board, and the Board did not vote on Ms. Litaker's transfer per paragraph 5 of her principal contract. (Doc. 21-1, p. 47); *see* p. 9, *supra*. Ms. Litaker agreed to the transfer, and her salary did not change. (Doc. 21-1, p. 45).

At the November 15 meeting, Ms. Litaker asked Mr. Craig and Ms. Barber what would be said about her transfer. Mr. Craig, Ms. Barber, and Ms. Litaker agreed that Ms. Craig and Ms. Barber would explain that Ms. Litaker had been asking about other jobs in the Central Office, and Ms. Barber had been wanting to move back into a school, hence the transfer. (Doc. 21-1, p. 16; *see also* Doc. 21-1, pp. 8, 11-12).

Ms. Litaker was hosting a lunch for the faculty at Trace Crossings the next day. Mr. Craig and Ms. Barber told Ms. Litaker to "send out an email and [] leave the school around 12:30." (Doc. 21-1, p. 8). Ms. Litaker was to instruct the faculty to meet Mr. Craig and Ms. Barber in the library after school. (Doc. 21-1, p. 8). Ms. Litaker did as she was told. (Doc. 21-1, p. 12).

Mr. Craig and Ms. Barber initially indicated that they would make Ms. Litaker an assistant principal at Bumpus Middle School. (Doc. 21-1, p. 8). Ms. Litaker responded that an assistant principal position was not acceptable. (Doc. 21-1, p. 8). Mr. Craig told Ms. Litaker that he was "going to make [her] a principal again as quick[ly] as [he could]." (Doc. 21-1, p. 8). Mr. Craig and Ms. Barber agreed that Ms. Litaker would receive paid professional leave through the end of 2012 which would give Ms. Litaker time to work on her doctoral dissertation. (Doc. 21-1, p. 13).

Ms. Litaker's last official day at Trace Crossings was November 16, 2012. (Doc. 21-1, p. 7). She left before the lunch that she was hosting ended. (Doc. 21-1, p. 12). That afternoon, Ms. Barber sent an email to her distribution list, which included Central Office staff, principals, and administrators. Ms. Litaker was included in the mail. (Doc. 21-1, p. 16). The email reads:

> Just to update you on a few changes that are occurring for the district. . . . . . remember, change is positive!!
>
> Robin Litaker, principal at Trace Crossings, has been talking to us about some different opportunities that are being considered for the Hoover district. Currently, Robin has asked for some time to work on her dissertation and will be taking a few weeks to focus attention on this important task. Robin's assignment to her new position will be finalized when she returns from this professional leave. Meanwhile, I plan to move from my [Central Office] position to fill the principal position at [Trace Crossings]. I will begin at [Trace Crossings] on Monday, Nov. 26; we notified the faculty/staff this afternoon. I will continue to work with [Central Office] responsibilities, operating from the office at [Trace Crossings], until my responsibilities are reassigned

or until a suitable replacement to assist with some of the tasks has been identified.

I will not be in B[irming]ham over the Thanksgiving break (family trip) but will be available via email or phone should you have any reason to contact me.  I hope everyone has a happy Thanksgiving— spend time with family and above all, join me in giving thanks for our numerous blessings!  We are so fortunate!!

Happy Thanksgiving!

(Doc. 21-1, p. 102).

Ms. Litaker returned to Trace Crossings on November 17, 2012 to finish cleaning her office.  (Doc. 21-1, p. 15).  Ms. Barber also was at the school that day.  Ms. Barber told Ms. Litaker that she (Ms. Barber) wanted Ms. Litaker to "be in the school.  Nothing is going to change.  I want these teachers to see you in here working with me."  (Doc. 21-1, p. 15).  Ms. Barber told Ms. Litaker that three people had a hand in her transfer:  Dot Riley, a retired district employee who preceded Ms. Litaker as the principal at Trace Crossings; Dr. Smith, the assistant principal at Trace Crossings during the 2010-2011 school year who, as of 2015, was coordinating standardized testing for the district; and Amanda Stone, who became Trace Crossings assistant principal after Dr. Smith moved to the Central Office.  (Doc. 21-1, pp. 5, 15; Doc. 27-1, ¶¶ 10, 12).

On November 19, 2012, Ms. Barber sent another email to her distribution list.  (Doc. 21-1, p. 16; Doc. 21-2, p. 29).  Ms. Litaker was not included in this email.  (Doc. 21-1, p. 16).  The email reads:

Beginning Nov. 26, I will officially become a member of the elementary administrative team. Just needed to share a bit more than what I felt comfortable putting in the email last Friday afternoon…..

I am moving to [Trace Crossings] as Robin transitions to another district administrative position. Robin did an outstanding job at [Trace Crossings]–she is not being moved for lack of effort, poor job performance, or any of the common reasons one normally sees for making a principal move in the middle of a school year. Robin did exactly what she asked to do---to hold teachers and staff at [Trace Crossings] accountable for high standards related to their job performance. As Robin unraveled the layers and layers of 'issues,' feathers were ruffled; feelings were hurt; people started arguing (oftentimes among themselves); lots of backstabbing and throwing of people under the bus; in a nutshell—extremely low morale, poor climate and negative culture. Once respect and trust are lost, it becomes a lost battle. When the 'good' teachers begin to complain (they were threatening to leave due to the lack of trust and respect) it became apparent that we had to make some type of change. It was NOT fair to Robin to have her to continue to work 24/7 and for it to be for naught! Neither was it fair to the kids. When teachers spend more time 'fussing' than they do planning for their classroom, it will ultimately negatively impact student learning.

Robin is taking this week to be with her family, and plans to take the rest of the time between this Thanksgiving break and winter break to work on her dissertation. This is healthy for her—when she returns after winter break, we will look[] at several administrative positions that will be available for her to assume.

I am excited about the opportunity to join the ranks of elementary administration. I am going to need lots and lots of help…..things have changed dramatically since I have been principal and OMS—the curriculum!!!! I know good teaching and know how to organize curriculum—what I don't have first-hand knowledge about is the current programs. It will be a steep learning curve for me and yes, please be patient when I call for help!!! You may receive some very elementary questions……

My first challenge will be to try to restore some aspect of positive climate/culture to this school. That is primary challenge number 1. Robin will be helping me to get a handle on the day-to-day operation stuff here at [Trace Crossings]. There are no plans to change direction or even to change practices/procedures Robin implemented. After about a month with [Carol Barber], they may very well all be wishing they had Robin back!

Hope this helps to clarify what is going on! Not easy to communicate via email but I am leaving for the next week and no time to get together as a group. I really am looking forward to working with all of you as a fellow 'justice league' member (where do I get the t-shirt?)!

Have a great Thanksgiving!!!!

(Doc. 21-1, pp. 103-104).

Neither Ms. Litaker nor Mr. Craig approved Ms. Barber's November 19, 2012 email. (Doc. 21-1, pp. 15-16; Doc. 21-2, p. 114). Ms. Litaker believes that statements in the email are false. She explained that the climate and culture at Trace Crossings were poor before she arrived, and both "had progressively gotten better" under her leadership. (Doc. 21-1, p. 17). Ms. Litaker explained that every time Ms. Barber had attended a team meeting or an event at Trace Crossings, she was very complimentary. (Doc. 21-1, p. 17). Ms. Litaker acknowledges that when she first arrived at Trace Crossings in 2010 and held teachers and staff accountable to standards, feathers were ruffled, but she believes that things had improved. (Doc. 21-1, pp. 17-18). Ms. Litaker also testified that she did not know of teachers who were threatening to leave because of lack of trust and respect. She explained

that a number of teachers had requested transfers for professional reasons, such as wanting to be in a school closer to home.  (Doc. 21-1, p. 19).

Someone sent Ms. Barber's November 19, 2012 email to a newspaper reporter.  (Doc. 21-4, p. 30).  Mr. Craig did not investigate to determine who sent the email to the reporter.  (Doc. 21-4, p. 30; *see also* Doc. 21-2, p. 33).  A November 26, 2012 newspaper article about Ms. Litaker's reassignment mentions both of Ms. Barber's email messages.  Although the article does not quote either message directly, the article states that Ms. Barber told the district's elementary school principals that "in trying to hold people accountable for high standards, [Ms. Litaker] had ruffled feathers and hurt people's feelings, leading to low morale, a poor climate and negative culture at the school."  (Doc. 27-6, p. 2).

After reading the newspaper article, Ms. Litaker and Mr. Craig exchanged email messages.  Mr. Craig indicated that he was confused by the article.  (Doc. 21-1, p. 20).  After Thanksgiving, Ms. Litaker met with Mr. Craig to discuss the aricle.  (Doc. 21-1, pp. 14, 20).  Ms. Litaker told Mr. Craig that Ms. Barber's statements were not true, and she felt that Ms. Barber's comments had ruined her reputation.  (Doc. 21-1, p. 20).  Mr. Craig responded, "I know. I don't know why [Ms. Barber] does things like that.  I am going to take care of you, I am going to rebuild your reputation."  (Doc. 21-1, p. 21).  Mr. Craig told Ms. Litaker that he "was going to . . . reorganize the district in the spring [of 2013], and when he did,

he would take care of [Ms. Litaker]." (Doc. 21-1, p. 13). During their meeting in late November 2012, Mr. Craig and Ms. Litaker did not determine what Ms. Litaker's new position would be. (Doc. 21-4 p. 37). Ms. Litaker told Mr. Craig "how important it was for [her] to remain as a principal." (Doc. 21-1, p. 13). Mr. Craig asked Ms. Litaker if she would consider a director's position; Ms. Litaker told Mr. Craig that she would. (Doc. 21-1, p. 13).

Ms. Litaker reported to the Central Office in January 2013, after the holiday break ended. She sat for two days waiting for an assignment. (Doc. 21-1, p. 13). Initially, Ms. Litaker worked out of a room with a folding table and a small chair. (Doc. 27-1, ¶ 37). Within "a few days," Ms. Litaker had an office of her own. (Doc. 21-7, p. 14). Ms. Litaker did not receive a formal title. (Doc. 21-4, p. 33; Doc. 27-1, ¶ 38). Mr. Craig assigned Ms. Litaker several tasks which included closing out a safe and drug free school grant and conducting a safety review of the district's schools. (Doc. 21-1, p. 13). As part of her safety review, Ms. Litaker visited every school except Trace Crossings. People asked Ms. Litaker what she was doing and what her new job was. Ms. Litaker was embarrassed and asked Mr. Craig to place her in a permanent position and give her a title. (Doc. 27-1, ¶ 39). Mr. Craig asked Ms. Litaker to tell people that she did not know what her title was, but she was helping the superintendent. (Doc. 27-1, ¶ 39). Mr. Craig asked Ms. Litaker to be patient and stated that he would take care of her. (Doc. 21-1, p. 13).

Mr. Craig told Ms. Litaker that he would assign her to a position when he reconfigured district leadership later in the spring of 2013. (Doc. 27-1, ¶ 39).

Shortly after Ms. Litaker began her work in the Central Office, Ms. Barber emailed Ms. Litaker and asked for information that was publicly available or that Ms. Barber already had in her possession. (Doc. 21-1, p. 23). Ms. Litaker testified that she provided Ms. Barber "extensive files and information," and she believes that Ms. Barber was trying to make it appear as though Ms. Litaker "hadn't completed or done some things that had already been done [at Trace Crossings]." (Doc. 21-1, p. 23).

On January 28, 2013, Ms. Litaker met with Ms. Barber and Ms. Veal. (Doc. 21-1, p. 32). Ms. Barber and Ms. Litaker discussed a number of topics. Ms. Barber asked for help locating test data and other documents at Trace Crossings. (Doc. 21-1, pp. 34-36). Ms. Barber expressed concern that as Trace Crossings's principal, Ms. Litaker may not have run a particular program correctly. (Doc. 21-1, p. 32). Ms. Barber discussed concerns that Ms. Litaker had given preferential treatment to certain students with respect to classroom placement. (Doc. 21-1, p. 33). Ms. Barber also asked Ms. Litaker about rumors circulating that Ms. Litaker would return to Trace Crossings. (Doc. 21-1, p. 32; Doc. 21-2, pp. 36-37). Ms. Barber asked Ms. Litaker if she had been in contact with Trace Crossings parents. (Doc. 21-2, p. 37). Ms. Litaker explained that she attended a PTO Christmas

luncheon at the school after getting permission from Mr. Craig and Ms. Barber to attend. (Doc. 21-1, p. 32). Immediately after the January 2013 meeting, Ms. Litaker asked Mr. Craig whether he thought Ms. Barber called the meeting "to attack [her]." (Doc. 21-1, p. 34). Mr. Craig responded, "no," and he "reassured [Ms. Litaker] that she was okay, he was going to take care of [her], and [Ms. Litaker] was doing a good job doing what [she] was doing." (Doc. 21-1, p. 34).

Ms. Litaker then called CLAS Executive Director Earl Franks. (Doc. 21-1, p. 34). CLAS is a professional organization for school administrators. (Doc. 21-1, p. 31). Ms. Litaker told Mr. Franks about the meeting with Ms. Barber and Ms. Veal, and she explained that she "felt like something just wasn't right with what [she] felt like [she] had been promised." (Doc. 21-1, p. 31). Ms. Litaker met with Mr. Franks several days later, and he agreed to speak to Mr. Craig on her behalf. (Doc. 21-1, pp. 34-35). In early February 2013, Mr. Franks told Ms. Litaker "pretty much the same thing that [Mr. Craig] had said, that [Mr. Craig] was going to restructure in the spring, and that [Mr. Craig] wasn't ready to tell me what my position would be. But I was reassured that I was going to be okay." (Doc. 21-1, p. 35).

Ms. Litaker repeatedly asked Mr. Craig what her title would be. (Doc. 21-1, p. 13). Mr. Craig received feedback from others that Ms. Litaker was becoming anxious to be placed in a permanent position. (Doc. 21-4, p. 37). Mr. Craig asked

Dr. Dodson to talk with Ms. Litaker about the assistant principal position at Crossroads. (Doc. 21-5, ¶ 6; Doc. 21-7, pp. 15-17). Dr. Dodson told Ms. Litaker, "We have decided what we are going to do with you next year . . . You are going to be the assistant principal at Crossroads School. . . . And you had better be there in the morning after the Board meeting. They will pass it at the next Board meeting." (Doc. 21-1, p. 29; *see* Doc. 21-1, p. 36). Dr. Dodson told Ms. Litaker that the move to Crossroads, the district's alternative school, would not affect her pay. (Doc. 21-1, p. 29; Doc. 21-7, p. 15). Ms. Litaker indicated that she needed to speak with Mr. Craig and would not discuss the issue with Dr. Dodson. (Doc. 21-1, p. 29; Doc. 21-7, p. 18).

Ms. Litaker emailed Mr. Craig because she wanted to discuss the conversation she had with Dr. Dodson. Mr. Craig did not respond. (Doc. 21-1, pp. 30-31). Ms. Litaker called Mr. Franks after her meeting with Dr. Dodson, and Mr. Franks offered to speak with Mr. Craig. (Doc. 21-1, p. 35). Mr. Franks was unable to get information from Mr. Craig. (Doc. 21-1, p. 36). Mr. Franks assigned an attorney to Ms. Litaker when she decided that she would retire instead of reporting to Crossroads as the assistant principal. (Doc. 21-1, pp. 35-36).

According to Ms. Litaker, "Crossroads had a reputation of being a dumping ground for administrators Hoover wanted to run off." (Doc. 27-1, ¶ 49). Moreover, Ms. Litaker was not qualified for the position at Crossroads. Ms.

Litaker did not have a special education or counseling background; she had worked only at the elementary level, and Crossroads served grades six through twelve. (Doc. 27-1, ¶ 50; Doc. 27-8, p. 23).

According to Mr. Craig, the only positions available in early 2013 were assistant principal positions at Bumpus Middle School and Crossroads Alternative School. (Doc. 21-4, p. 37; Doc. 21-5, ¶ 6). Mr. Craig determined that Bumpus would not be a good placement for Ms. Litaker. (Doc. 21-2, p. 40; Doc. 21-4, p. 37). Ms. Litaker contends that other positions were available for the following reasons:

- the Assistant Superintendent position that became available when Ms. Barber became the principal at Trace Crossings (Doc. 27-1, ¶ 43);

- the Federal Programs position that became available when Linda Gurosky vacated the position in the spring of 2013 (Doc. 27-1, ¶ 45);

- the Student Services position, but Bob Lowry filled the position in the spring of 2013 (Doc. 27-1, ¶ 46); and

- the principal positions at Berry Middle School, Greystone Elementary School, and South Shades Crest Elementary School that became available near the time that Dr. Dodson told Ms. Litaker to report to Crossroads (Doc. 27-1, ¶ 47).

According to Mr. Craig, he stopped looking for a permanent position for Ms. Litaker when her attorney contacted him to request that the Board buy out her contract. (Doc. 21-5, ¶ 9; *see also* Doc. 21-1, p. 36). Ms. Litaker agreed to submit

her resignation and work from home.  The Board agreed to pay Ms. Litaker through the end of 2013.  (Doc. 21-1, p. 37; Doc. 21-1, p. 108; Doc. 21-5, ¶ 9).[6]

Ms. Litaker's last day of work in the Central Office was April 4, 2013 which is the same day she submitted her letter of resignation.  (Doc. 21-1, p. 38).  The letter reads:

> Mr. Craig,
>
> This letter is to inform you that I have set my retirement date.  I will retire from the Hoover City School System [e]ffective the last day of December 2013.
>
> My last day of work will be December 31, 2013.

(Doc. 21-1, p. 110).  In her declaration, Ms. Litaker stated that if Mr. Craig had told her that the Crossroads position was not an ultimatum, she would not have resigned, and she would have waited for Mr. Craig to reorganize district leadership after the April and May 2013 staff meetings.  (Doc. 27-1, ¶ 51).[7]

---

[6] Ms. Litaker received her standard raise for 2013 consistent with the terms of her principal contract.  (Doc. 21-1, p. 38; *see also* Doc. 21-1, p. 124).

[7] Mr. Craig testified that he did not intend the Crossroads offer as an ultimatum.  (Doc. 21-5, ¶ 7).  According to Mr. Craig, if Ms. Litaker did not want to go to Crossroads, Ms. Litaker could have continued working in the central office until Mr. Craig found a permanent position.  (Doc. 21-5, ¶ 7).  Viewing the record in the light most favorable to Ms. Litaker, the Court accepts as true for purposes of summary judgment Ms. Litaker's assertion that no one told her that the Crossroads position was optional.

# III.  ANALYSIS

## A.  Title VII Gender Discrimination

### 1.  Title VII Claim Against the Board

In framing her Title VII claim against the Board, Ms. Litaker does not challenge her transfer from Trace Crossings "*per se*." (Doc. 28, p. 15).  For purposes of her Title VII claim, Ms. Litaker contends that the Board discriminated against her on the basis of her gender when Mr. Craig moved her to the Central Office, because unlike the permanent positions that Mr. Craig provided to other male principals who were transferred, Mr. Craig moved Ms. Litaker "without specific direction or assignment" and offered her only a demotion.  Ms. Litaker describes a district in which male principals generally received support and favorable treatment, while female principals were shuffled about with little regard for their qualifications or reputations.  Thus, Ms. Litaker's theory of recovery rests of circumstantial evidence regarding preferential treatment of male principals.

Where, as here, a plaintiff relies on circumstantial evidence to establish discriminatory intent, a district court considers the *McDonnell Douglas* analytical framework to evaluate the sufficiency of the plaintiff's evidence.  Under that burden-shifting framework, a plaintiff may establish a prima facie case of discrimination by showing: "(1) that [s]he is a member of a protected [] class, (2) that [s]he was qualified for the position, (3) that [s]he experienced an adverse

employment action, and (4) that [s]he was replaced by someone outside of h[er] protected class or received less favorable treatment than a similarly situated person outside of h[er] protected class." *Flowers v. Troup Cty., Ga. School Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015). "The methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). If the plaintiff presents a prima facie case, then the burden shifts to the defendant to articulate a gender-neutral basis for the employment action at issue. If the defendant carries this light burden, then the burden returns to the plaintiff to prove that the defendant's stated reason for its conduct is pretext for discrimination. *See Flowers*, 803 F.3d at 1336.

But "'the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion' in Title VII cases." *Flowers*, 803 F.3d at 1336 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). A plaintiff's gender discrimination claim may survive summary judgment if the evidence, viewed in the light most favorable to the plaintiff, "presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Lockheed-Martin Corp.*, 644 F.3d at 1328 (quoting *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 733 (7th Cir. 2011)). "Whatever form it takes, if

the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.'" *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328). A "plaintiff retains 'the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Flowers*, 803 F.3d at 1336 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

### a.    Ms. Litaker's Prima Facie Case

The Board does not contest (*see generally* Doc. 23, pp. 16-22), and the Court finds that Ms. Litaker has established the first, second, and fourth elements of her prima facie case. As a female, Ms. Litaker is a member of a protected class. *See* 42 U.S.C. 2000e-2(a). After successful completion of a two-year probationary contract, the Board gave Ms. Litaker a three-year principal contract. Therefore, she was qualified for her position or another administrative position consistent with the terms of her principal contract. In addition, the evidence demonstrates that the Board treated a similarly-situated male principal, Chris Shaw, more favorably than the Board treated Ms. Litaker.

Mr. Shaw was the principal at Spain Park High School from July 1, 2010 until February 29, 2012. (Doc. 21-6, p. 8; Doc. 27-9, pp. 2-3). On February 29, 2012, Mr. Craig removed Mr. Shaw from his position as principal at Spain Park

and transferred him to the administrative position of Planning Director for the Hoover school system. (Doc. 27-9, p. 3). Mr. Craig decided to transfer Mr. Shaw from Spain Park because Mr. Craig was not pleased with the "overall direction" that the school was taking. (Doc. 21-4, p. 45).

The Planning Director position did not exist before Mr. Craig decided to transfer Mr. Shaw to the position, so Mr. Craig approached Ms. Barber and "discussed the possibility of Mr. Shaw moving into that [] position" and asked Ms. Barber to draft a job description for the position. (Doc. 21-2, pp. 43-44).[8] According to Mr. Craig, he envisioned that the Planning Director would help coordinate landscape bids and rental of the school district's facilities. (Doc. 21-4, p. 45). Mr. Craig believed the planning director position was "specific to some of the things that [he] needed done at the time." (Doc. 21-4, p. 45). Mr. Craig submitted a personnel recommendation form explaining Mr. Shaw's transfer, and pursuant to Mr. Shaw's principal contract, the Board voted to approve Mr. Craig's recommendation that the district name Mr. Shaw to the Planning Director position. (Doc. 21-4, p. 177; Doc. 27-7, p. 2; Doc. 27-9, p. 3; Doc. 27-10, pp. 2-3).

Mr. Craig transferred both Ms. Litaker and Mr. Shaw from principal positions in the middle of the school year because of general concerns regarding their respective schools. Unlike Ms. Litaker, Mr. Craig immediately created for

---

[8] In early 2012 when she drafted the Planning Director job description, Ms. Barber still was working in her capacity as Assistant Superintendent.

Mr. Shaw a titled position in the Central Office. Unlike Ms. Litaker, Mr. Craig followed the procedures in the principal's contract regarding Board approval of Mr. Shaw's transfer; consistent with Mr. Shaw's contract, the Board voted to approve Mr. Craig's recommendation that the Board transfer Mr. Shaw to the Planning Director position. Unlike Mr. Shaw, Mr. Craig effectively demoted Ms. Litaker, first giving her untitled jobs to do in the Central Office and then having Dr. Dodson instruct Ms. Litaker that she must report to Crossroads as an assistant principal -- Crossroads being the school where Mr. Craig would send employees who the school district wanted to "chase off."

The Board argues that Ms. Litaker cannot establish a prima facie case of discrimination because she cannot prove the third element of her prima facie case. (Doc. 23, pp. 20-22). The Court disagrees.

"'An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" *Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (quoting *Gupta v. Florida. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (internal quotation omitted)).

The Board contends that Ms. Litaker voluntarily resigned and sought a buyout of her contract, and therefore the Board cannot be liable because it took no adverse action against Ms. Litaker. (Doc. 23, p. 22). Ms. Litaker's evidence creates a question of fact concerning the voluntariness of her resignation. "An employee's resignation will be deemed involuntary where the employer (1) forces the resignation by coercion or duress, or (2) obtains the resignation by deceiving or misrepresenting a material fact to the employee." *Ross v. City of Perry, Ga.*, 396 Fed. Appx. 668, 670 (11th Cir. 2010) (citing *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995)).

"Under the misrepresentation theory, a court may find a resignation to be involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of material fact concerning the resignation." *Hargray*, 57 F.3d at 1570. Ms. Litaker testified that she would not have resigned if she had known that she had an alternative to placement as the assistant principal at Crossroads. (Doc. 27-1, ¶ 51). At the summary judgment stage, the Court cannot accept as true Mr. Craig's testimony that Ms. Litaker was not forced to accept the Crossroads position and that she could have continued to work at the Central Office pending a permanent placement. Drawing all reasonable inferences in Ms. Litaker's favor, Mr. Craig repeatedly assured Ms. Litaker that he would take care of her and assign her to a permanent principal or director position, but in early April 2013, Mr.

Craig, through Dr. Dodson, told Ms. Litaker that she must report to Crossroads as the assistant principal. When Ms. Litaker attempted to discuss the Crossroads placement with Mr. Craig, he refused to meet with her or return her email messages. (Doc. 21-1, pp. 30-31). A jury must determine whether the Board and Mr. Craig secured Ms. Litaker's resignation by misrepresenting a material fact.

### b.    The Board's Articulated Legitimate Non-Discriminatory Reason

The Board's burden to produce evidence of a legitimate non-discriminatory reason for its employment decision is "exceedingly light." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (internal quotations and citation omitted). "[T]he proffered reason need only be "one that might motivate a reasonable employer." *Chapman v. Al Transport*, 229 F.3d 1012, 1031 (11th Cir. 2000) (en banc). "The reason offered by an employer for an action does not have to be a reason that the judge or jurors would act on or approve. . . . Instead all that matters is that the employer advance an explanation that is not discriminatory in nature." *Schoenfield v. Babbitt*, 168 F.3d 1257, 1269 (11th Cir. 2000) (internal quotations and citations omitted).

Mr. Craig testified that he created the Planning Director position for Mr. Shaw because the school district had an immediate need for help with specific, short-term tasks because of two retirements in the Central Office. (Doc. 21-5, p. 6, ¶ 12). With respect to Ms. Litaker's transfer, Mr. Craig testified that he "did not

have a specific, identifiable [administrative] need," and Mr. Craig wanted to find a long-term position for Ms. Litaker through the annual staffing process in the spring of 2013. (Doc. 21-5, pp. 5-6, ¶¶ 8, 13; *see also* Doc. 21-4, p. 53). Because Mr. Craig did not have a full-time position available when he transferred Ms. Litaker, Mr. Craig asked Ms. Litaker to help with two projects at the beginning of the spring semester, with the goal of identifying a permanent position by the end of the semester. (Doc. 21-5, ¶ 5).

This evidence provides a gender-neutral reason for Mr. Craig's failure to give Ms. Litaker a titled position at the Central Office immediately upon her transfer. Therefore, to survive summary judgment, Ms. Litaker "must introduce significantly probative evidence showing that [the Board's] asserted reason [for its decision] is merely pretext for discrimination." *Brooks v. Cnty. Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotation marks and citation omitted).

### c.    Pretext

Ms. Litaker can show that the Board's proffered reason is pretext "directly, by persuading the court that a discriminatory reason more likely than not motivated the employer, or indirectly, by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them

unworthy of credence.'" *Paschal v. United Parcel Serv.*, 573 Fed. Appx. 823, 825 (11th Cir. 2014) (quoting *Alvarez v. Royal Atlantic Devlopers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010)). Ms. Litaker's burden "is to show not just that [the Board's] proffered reasons for [its decisions] were ill-founded but that unlawful discrimination was the true reason." *Alvarez*, 610 F.3d at 1267. The Court does not "sit as a 'super-personnel department,' and it is not [the Court's] role to second-guess the wisdom of [the Board's] business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Id.* at 1266 (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)).

Ms. Litaker argues that Mr. Craig's testimony that he had no full-time positions available when Ms. Litaker arrived at the Central Office is false because there were a number of positions in which Mr. Craig could have placed her immediately. (Doc. 15, pp. 17-18). Ms. Litaker contends that the following positions were open near the time of her transfer:

- Principal position at Greystone Elementary School (Doc. 21-1, p. 47; Doc. 27-8, p. 21);

- Principal position at Berry Middle School, a position given to a male. (Doc. 21-6, p. 29);

- Principal position at South Shades Crest Elementary School (Doc. 21-

1, p. 47; Doc. 21-6, pp. 27, 29);

- Instructional Coordinator of Federal Programs and Testing  (Doc. 21-6, p. 28);

- Chief Academic Officer for Mathematics and Science  (Doc. 21-6, p. 29);

- Chief Academic Officer for Reading and Humanities (Doc. 21-6, p. 29);

- Ms. Barber's Assistant Superintendent position  (Doc. 21-6, p. 28);

- Student Services position, a position filled by a former male principal (Doc. 21-1, p. 27; Doc. 21-6, pp. 29-30); and

- Director of Curriculum and Instruction (Doc. 27-8, pp. 5, 21).

The possible availability of certain administrative positions, standing alone, does not support "an inference of unlawful discrimination."  *Flowers*, 803 F.3d at 1339 ("The burden placed on Title VII plaintiffs to produce additional evidence suggesting discrimination after contradicting their employer's stated reasons is not great, but neither is it nothing.").  But "a contradiction of the employer's preferred reason for the [adverse employment action] is sometimes enough, when combined with other evidence, to allow a jury to find that the [adverse action] was the result of unlawful discrimination."  *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1307 (11th Cir. 2012).  In this case, the record contains other evidence from which

reasonable jurors could infer that Mr. Craig intentionally discriminated against Ms. Litaker by treating her less favorably than male principals when he transferred her.

For example, unlike Mr. Shaw, the Board did not follow its policies when Mr. Craig transferred Ms. Litaker. Both Mr. Shaw's and Ms. Litaker's principal contracts stated that Mr. Craig had to recommend a proposed a transfer to the Board, and the Board had to vote to approve the transfer. Mr. Craig and the Board followed this procedure with respect to Mr. Shaw's mid-year transfer. Mr. Craig and the Board did not follow this procedure with respect to Ms. Litaker's mid-year transfer. (Doc. 21-1, p. 47; Doc. 21-4, p. 177; Doc. 27-7, p. 2; Doc. 27-9, p. 3; Doc. 27-10, pp. 2-3). This is evidence from which a jury could conclude that the Board's stated reason for placing Ms. Litaker in limbo and then giving her a demotion to assistant principal was pretext. *See Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286 (11th Cir. 2006) ("[A]n employer's deviation from its own standard procedures may serve as evidence of pretext.") (citation omitted); *Ritchie v. Industrial Steel, Inc.*, 426 Fed. Appx. 867, 873 (11th Cir. 2011) ("A plaintiff can [] show pretext by demonstrating that the employer did not follow its normal procedures in terminating [her] employment.") (citing *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985)).

Moreover, before he transferred Mr. Shaw, Mr. Craig approached Ms. Barber and asked her to create a titled position and job description based on the

landscaping and facilities rental tasks that Mr. Craig thought needed attention when Mr. Shaw arrived at the Central Office. (Doc. 21-2, pp. 43-44; Doc. 21-4, p. 45). When Ms. Litaker arrived at the Central Office, Mr. Craig also had tasks with which he needed help. These tasks involved student safety. Mr. Craig did not ask Ms. Barber or any other district administrator to create a titled position and job description based on those needs as he had done for Mr. Shaw.

Mr. Craig's decision to create a titled position specifically for Mr. Shaw is consistent with how the Board selected Bob Lawry to fill the Student Services position in the Central Office at the end of the 2012-2013 school year. Before he became the district's Student Services Specialist, Mr. Lawry was the principal at South Shades Crest Elementary School. (Doc. 21-4, p. 47; Doc. 21-6, pp. 27-28). According to Ms. Litaker, sometime during the 2012-2013 school year, Mr. Lawry and Mr. Craig "had some pretty tough conversations about things," and Mr. Lawry understood that the Board would not offer him another principal contract. (Doc. 21-1, pp. 27-28). Ms. Litaker testified that it "was common knowledge" that at the end of the school year, Mr. Craig would move Mr. Lawry into the Student Services position. (Doc. 21-1, pp. 27-28). The Board contends that it posted the Student Services position, Mr. Lawry applied, and the Board selected him for the position. (Doc. 21-4, p. 47; Doc. 21-6, pp. 27-28). But Mr. Craig concedes that "as we approached the end of [Mr. Lawry's] existing contract . . . we talked about what –

where he saw himself, what he would like to do in Hoover City Schools." (Doc. 21-4, p. 47). Mr. Craig transferred Ms. Litaker without identifying a formal position for her and ultimately offered Ms. Litaker a demotion.[9] Drawing all reasonable inferences in Ms. Litaker's favor, a jury could conclude that Mr. Craig went out of his way to ensure that male principals were protected or given plum positions, but Mr. Craig did not do the same for female principals like Ms. Litaker.

The record also demonstrates that the Board gave male principals opportunities to improve their performance. According to Ms. Litaker, it was "common knowledge" that the Board placed Bluff Park Elementary Principal David Fancher and Simmons Middle School Principal Brian Cain on corrective action plans designed to give Mr. Fancher and Mr. Cain chances to address identified problems at their respective schools. (Doc. 21-1, pp. 39-42). The Board did not do the same for Ms Litaker. (Doc. 21-1, p. 40). Instead, after providing Ms. Litaker positive reviews for her first two years at Trace Crossings and just five months after extending a three-year principal contract to Ms. Litaker, Mr. Craig removed her from Trace Crossings with no warning or indication that her performance could lead to her removal from the school. Mr. Craig's decision to transfer Ms. Litaker from Trace Crossings under these circumstances, combined with evidence that Mr. Craig generally gave male principals second chances and

---

[9] The only two placements that Mr. Craig considered for Ms. Litaker were assistant principal positions. Either would have been a demotion.

arranged for intra-district transfers of male principals to titled Central Office positions is evidence from which a jury could infer that Mr. Craig treated Ms. Litaker less favorably because she was a woman. Jurors also could consider the fact that the Board took no action against male principals who failed to meet AYP, but the Board transferred female principals who failed to meet AYP. *See* p. 11, above. These inconsistences are part of the mosaic of evidence on which Ms. Litaker may rely.

Based on the particular facts and circumstances in this case, a jury could conclude that the Board's stated reasons for its decision to transfer and demote Ms. Litaker are false and that the real reason for the employment action was gender discrimination. Genuine issues of material fact preclude summary judgment on Ms. Litaker's Title VII claim against the Board.

## 2. Title VII Claim Against Mr. Craig

In Count I of her complaint, Ms. Litaker alleges that Mr. Craig discriminated against her because of her gender. (Doc. 1, p. 3). Mr. Litaker does not specify whether she asserts an individual capacity or official capacity claim, or both, against Mr. Craig. Regardless, Mr. Craig is entitled to judgment as matter of law on Ms. Litaker's Title VII claim. Mr. Craig, in his individual capacity, is not subject to suit under Title VII. *See Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) ("Individual capacity suits under Title VII are [] inappropriate.

The relief granted under Title VII is against the *employer*, not individual employees whose actions would constitute a violation of the Act.") (emphasis in *Busby*). "[T]he proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly." *Id.* Because Ms. Litaker has named the Hoover Board of Education as a defendant, an official capacity Title VII claim against Mr. Craig is unnecessary. *See id.*; *see also Lewis v. Eufala City Bd. of Educ.,* 922 F. Supp. 2d 1291 (M.D. Ala. 2012) (granting summary judgment in favor of school board members and superintendent on the plaintiff's official capacity Title VII claims and noting that "because [the plaintiff] has named the school board as a defendant on her Title VII retaliation claim, naming [the school superintendent and school board members] as defendants in their 'official capacities' was redundant").

**B.     Fourteenth Amendment Due Process**

**1.     Official Capacity Claims against Mr. Craig and Ms. Barber**

"[W]hen an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent." *Busby*, 931 F.2d at 776 (internal quotation marks,

citations, and footnote omitted).[10]  Ms. Litaker's § 1983 official capacity claims against Mr. Craig and Ms. Barber are duplicative of her § 1983 due process claim against the Board.  *Busby*, 931 F.2d at 776.  Therefore, Mr. Craig and Ms. Barber, in their official capacities, are entitled to judgment as a matter of law on Ms. Litaker's due process claim.  *See Busby*, 931 F.2d at 776 (affirming directed verdict in favor of municipal defendants on § 1983 official capacity claims because "[t]o keep both the City and the officers sued in their official capacity as defendants . . . would have been redundant and possibly confusing to the jury.").

### 2. Individual Capacity Claims against Mr. Craig and Ms. Barber and Claim against the Board

Ms. Litaker contends that the defendants violated her Fourteenth Amendment due process rights by transferring her from Trace Crossings to the Central Office without a Board vote and without placing her in a permanent position and by reassigning her to the assistant principal position at Crossroads. (Doc. 1, ¶ 27; Doc. 28, pp. 23-25; Doc. 29, p. 10).

The Due Process Clause of the Fourteenth Amendment provides that no state "shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend XIV, § 1.  To establish a § 1983 procedural due process

---

[10] It is unclear from Ms. Litaker's complaint whether she asserts official capacity § 1983 claims against Mr. Craig and Ms. Barber (Doc. 1, pp. 6-7), and Ms. Litaker did not respond to the defendants' arguments concerning official capacity § 1983 claims (Doc. 29, pp. 6-12).  The Court includes a brief discussion of official capacity § 1983 claims to account for the possibility that Ms. Litaker may have intended to assert such claims against Mr. Craig and Ms. Barber.

claim against the Board or Mr. Craig and Ms. Barber in their individual capacities, Ms. Litaker must show: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Arrington v. Helms*, 438 F.3d 1336, 1347 (11th Cir. 2006) (internal quotation marks and citation omitted).

Ms. Barber is entitled to summary judgment on Ms. Litaker's individual capacity § 1983 claim because Ms. Barber did not deprive Ms. Litaker of a constitutionally protected property interest. Although Mr. Craig discussed Ms. Litaker's transfer from Trace Crossings with Ms. Barber, Mr. Craig, not Ms. Barber, made the decision to move Ms. Litaker to the Central Office. (Doc. 21-2, p. 24; Doc. 21-3, p. 3, ¶ 6; Doc. 21-4, p. 22; Doc. 21-5, p. 3, ¶ 4). Even if Ms. Litaker relied on statements that Ms. Barber made during the November 15, 2012 meeting regarding the transfer (*see* Doc. 29, p. 10), the record is undisputed that Ms. Barber did not make the personnel decision. In addition, after Ms. Litaker began her work in the Central Office, Ms. Barber did not have discussions with Mr. Craig about Ms. Litaker's placement in the school district. (Doc. 21-2, p. 39). Accordingly, Ms. Litaker has not established that Ms. Barber infringed upon a constitutionally protected property right. *See Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 737 (11th Cir. 2010) ("To establish § 1983 liability, a plaintiff must show proof of an affirmative causal connection between a government actor's acts

or omissions and the alleged constitutional violation, which may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation.") (internal quotation marks and citation omitted).

Ms. Litaker's due process claims against the Board and Mr. Craig in his individual capacity survive summary judgment. Ms. Litaker had a property right in continued employment with the Board, consistent with the terms of her three-year principal contract. *See Board of Regents v. Roth,* 408 U.S. 564, 577-78 (1972) (property rights are "created and defined" by the terms of employment, state statutes, and school rules or policies); *Arrington*, 438 F.3d at 1348 ("Property interests stem not from the Constitution, but from such sources as statutes, regulations, ordinances, and contracts."). Ms. Litaker contends that the Board and Mr. Craig deprived her of that right by forcing her to resign. As explained above, *see* pp. 31-33, *supra*, the question of whether Ms. Litaker's resignation was voluntary is one for the jury, and an involuntary resignation obtained through misrepresentation is "a deprivation of due process." *Hargray*, 57 F.3d at 1568; *Poindexter v. Dep't of Human Res.*, 946 F. Supp. 2d 1278, 1288 (M.D. Ala. 2013) ("If an employee can prove constructive discharge, she can also prove that the due process violation is complete; under such circumstances, the state will have already failed to provide the constitutional minimum of notice and an opportunity to be heard.").

Mr. Craig argues that even if the evidence concerning Ms. Litaker's discharge is disputed, the Court should enter judgment in his favor because he is entitled to qualified immunity on Ms. Litaker's § 1983 claim. "'Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Brown*, 608 F.3d 724, 733 (11th Cir. 2010) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)) (other internal quotation marks omitted). Qualified immunity allows government officials "'to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" *Brown*, 608 F.3d at 733 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). Qualified immunity "does not offer protection if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." *Holmes v. Kucynda,* 321 F.3d 1069, 1077 (11th Cir. 2003) (internal quotation marks and citations omitted) (alteration in *Holmes*).

An official asserting qualified immunity "must first prove that he was acting within the scope of his discretionary authority." *Lee*, 284 F.3d at 1194 (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)) (internal quotation

marks omitted).  For purposes of summary judgment, the Court assumes that Mr. Craig was acting within the scope of his discretionary authority.  Therefore, the Court must determine whether the facts, construed in the light most favorable to Ms. Litaker, "show that a constitutional right has been violated," and "whether the right violated was 'clearly established.'"  *Brown*, 608 F.3d at 734 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  As explained above, *see* pp. 31-33, *supra*, based on *Hargray*, the evidence, construed in the light most favorable to Ms. Litaker, demonstrates that it should have been clear to Mr. Craig that his conduct was unlawful.  It was clearly established in 2013 that obtaining an employee's resignation through misrepresentation and without adherence to the process dictated by a binding contract violates the due process clause.  *See Hargray*, 57 F.3d at 1568.  Therefore, the Board and Mr. Craig, in his individual capacity, are not entitled to judgment as a matter of law on Ms. Litaker's § 1983 due process claim.

### C.    Breach of Contract

Ms. Litaker contends that the Board breached her three-year principal contract by (1) moving her from her principal position to the Central Office without Board approval and not giving her a permanent position for several months, and (2) not evaluating her for the 2012-2013 school year.  (Doc. 1, ¶¶ 34, 36; Doc. 28, pp. 25-27).  Ms. Litaker claims that she suffered "monetary losses,"

and she "seeks damages for breach of contract." (Doc. 1, ¶ 41).

Under Alabama law, "[no] action shall lie for the recovery of damages for the breach of any employment contract of a contract principal in the public schools." Ala. Code. § 16-24B-6; *see also Yance v. Dothan City Bd. of Educ.*, 163 So. 3d 1070, 1074 (Ala. Civ. App. 2014). In *Yance*, the Alabama Court of Civil Appeals explained that "[b]y its plain and unambiguous language," § 16-24B-6 "precludes a contract principal from maintaining a civil action for damages for the breach of an employment contract." *Yance*, 163 So. 3d at 1074.

Alabama law requires a school board to "at least annually evaluate the performance of each contract principal" in the "manner prescribed by the State Board of Education." Ala. Code. § 16-24B-3(i)(1). If a school board fails to do so, then the contract principal's "contract shall be extended one additional contract year for each contract year not evaluated up to three years." Ala. Code § 16-24B-3(m); *see also* Doc. 21-1, p. 127. If Ms. Litaker had sought relief in the form of a one-year contract extension because of the Board's failure to evaluate her for the 2012-2013 school year, then the Court might entertain Ms. Litaker's breach of contract claim. *See Yance*, 163 So. 3d at 1074 (assuming without deciding that a plaintiff could maintain a civil action against a school board under § 16-24B-3(m) because in addition to compensatory damages, the plaintiff claimed that "he was entitled to an automatic one-year extension of his employment contract because of"

the defendant's failure to "properly evaluate his job performance during one of his contract years"). Unlike the plaintiff in *Yance*, Ms. Litaker seeks only compensatory damages for her breach of contract claim. (Doc. 1, ¶ 41; Doc. 1, p. 12). Therefore, even if the Board failed to properly evaluate Ms. Litaker for the 2012-2013 school year, she cannot survive summary judgment.

Therefore, the Board is entitled to summary judgment on Ms. Litaker's breach of contract claim.

### D. Defamation

Ms. Litaker's defamation claim against Mr. Craig and Ms. Barber is premised on the content of the November 19, 2012 email that Ms. Barber sent to elementary school principals. (Doc. 1, ¶¶ 44-46; *see* Doc. 21-1, pp. 17-22, 103-104). Ms. Litaker contends that Ms. Barber placed false information about her in the email, and Ms. Litaker asserts that Mr. Craig ratified Ms. Barber's false statements. Ms. Litaker maintains that the following statements in Ms. Barber's November 19, 2012 email are defamatory:

> As Robin unraveled the layers and layers of 'issues,' feathers were ruffled; feelings were hurt; people started arguing (oftentimes among themselves); lots of backstabbing and throwing of people under the bus; in a nutshell—extremely low morale, poor climate and negative culture. Once respect and trust are lost, it becomes a lost battle. When the 'good' teachers begin to complain (they were threatening to leave due to the lack of trust and respect) it became apparent that we had to make some type of change. It was NOT fair to Robin to have her to continue to work 24/7 and for it to be for naught! Neither was it fair to the kids. When teachers spend more time 'fussing' than they

do planning for their classroom, it will ultimately negatively impact student learning.

. . .

My first challenge will be to try to restore some aspect of positive climate/culture to this school.  That is primary challenge number 1.

. . .

(Doc. 21-1, pp. 103-104; *see also* Doc. 21-1, pp. 17).

To establish a prima facie case of defamation under Alabama law, a plaintiff must show: "[1] that the defendant was at least negligent [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)."  *Ex parte Bole*, 103 So. 3d 40, 51 (Ala. 2012) (quoting *Ex parte Crawford Broad. Co.*, 904 So. 2d 221, 225 (Ala. 2004)) (emphasis and internal quotation marks omitted).  If a court determines that a plaintiff in a defamation action is "a public official, public figure, or limited-purpose public figure," then the plaintiff must establish by clear and convincing evidence "that the defamatory statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard to whether it was false or not."  *Cottrell v. Nat'l Collegiate Athletic Ass'n*, 975 So. 2d 306, 333 (Ala. 2007) (citing *New York Times, Co. v. Sullivan*, 376 U.S. 254, 280 (1964)); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974); *Curtis Publ'g Co. v. Butts*, 388 U.S.

130, 162–164 (1967) (internal quotation marks omitted).  Whether Ms. Litaker is a public official, a public figure, or a private individual is a question of law for the trial court.  *See Ex parte Rudder*, 507 So. 2d 411, 416 (Ala. 1987); *see also Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966)

In *Barnett v. Mobile Cnty. Personnel Board*, a case involving a town mayor and town clerk, the Alabama Supreme Court defined a "public official" as follows:

> A "public official" must hold a position that would invite public scrutiny of the person holding it, apart from the scrutiny and discussion occasioned by the allegedly defamatory remarks. Furthermore, the "public office" should be one of such importance that the public has a particular interest in the qualifications and performance of the person holding that office beyond the public general interest in the qualifications and performance of all governmental employees.

536 So. 2d 46, 54 (Ala. 1988) (internal citation omitted).  In *Warren v. Birmingham Board of Education*, the Alabama Court of Civil Appeals affirmed the trial court's holding that an elementary school principal was a public official, "similar to the . . . town clerk in *Barnett*."  739 So. 2d 1125, 1129, 1133 (Ala. Civ. App. 1999). Accordingly, the Court finds that Ms. Litaker is a public official.

Because Ms. Litaker is a public official, for purposes of this litigation, to survive summary judgment, Ms. Litaker must be able to show by clear and convincing evidence that Ms. Barber acted with actual malice when she sent the November 19, 2012 email.  "[T]he actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term."  *Harte-Hanks Commc'ns v.*

*Connaughton*, 491 U.S. 657, 666 (1989). Instead, in a defamation action concerning a public official, the public official must be able to prove by clear and convincing evidence that the defendant acted with reckless disregard of the truth. *Id.*

A defendant acts with reckless disregard for the falsity of allegedly defamatory remarks when the defendant "in fact entertained serious doubts as to the truth of [its] publication . . . or acted with a 'high degree of awareness of . . . probable falsity.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) and *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). The evidence upon which a public official relies must show "more than a departure from reasonably prudent conduct." *Harte-Hanks Commc'ns*, 491 U.S. at 688. Instead, there must be evidence that indicates that the defendant "'entertained serious doubts as to the truth of [the] publication.'" *Harte-Hanks Commc'ns*, 491 U.S. at 688 (quoting *St. Amant*, 390 U.S. at 731).

In this case, the evidence does not meet this threshold. Ms. Barber seems to have based her statements on her perception. Ms. Veal and Dana Clement, a teachers' union representative, had reported to Ms. Barber that teachers at Trace Crossings were unhappy. (Doc. 21-3, ¶ 8). Ms. Litaker admits that in her first year at Trace Crossings, she ruffled some feathers. Ms. Litaker believes that the climate at Trace Crossings improved after her first year. (Doc. 21-1, pp. 17-18). Ms. Barber visited Trace Crossings in the fall of 2012 when Ms. Litaker was making adjustments to address the low test scores that impacted Trace Crossings's AYP. Ms. Litaker

acknowledged in her deposition that everyone was upset about those test scores, but she stated that everyone was working together to remedy the situation. (Doc. 21-1, p. 21).

Ms. Barber and Ms. Veal met with Assistant Principal Stone in October 2012. (Doc. 21-2, p. 23; Doc. 21-6, pp. 12, 71-73). During the meeting, Ms. Stone expressed concerns about data entry for a particular school program, test scores, and Ms. Litaker's demeanor. (Doc. 21-6, p. 12). Ms. Stone told Ms. Barber and Ms. Veal that "there was a lack of trust, and teachers were coming to complain to her, and she didn't know what to do with it because she wanted to remain loyal to Ms. Litaker." (Doc. 21-6, p. 12).

Also during the fall of 2012, Ms. Barber and Ms. Veal met with Dana Clement, a teachers' union representative, to discuss complaints about teachers working outside of their contract hours. (Doc. 21-2, pp. 21-22; Doc. 21-6, p. 16). On November 13, 2012, six days before Ms. Barber sent the November 19, 2012 email, the union representative sent a follow-up email to Ms. Barber. (Doc. 21-2, p. 95). The email states:

> Thank you so much for meeting with me last week to discuss employee concerns at Trace Crossings. Since our meeting I have continued to receive phone calls and messages from faculty and staff. The most recent calls have been to express growing concerns related to the assistant principal, Ms. Stone. It seems many in the school are concerned that Ms. Litaker is attempting to address problems at the school by placing blame on Ms. Stone and stating she was not aware that Ms. Stone had made certain decisions. My members in the

building seem to hold Ms. Stone in high esteem and feel she is being placed in a bad position, one that may require her to defend herself to you and other administrators.

I have assured those who are calling me that I would pass their concerns on to you and [Ms. Veal]. I do not personally know Ms. Stone, but I wanted to express to you the concerns many are having for her at this time.

Please do not hesitate to contact me if you have additional questions.

Thank you.

Dana

(Doc. 21-2, p. 95).

These interactions may have affected Ms. Barber's perception of the climate at Trace Crossings. Ms. Litaker disagrees with the manner in which Ms. Barber's November 19, 2012 email message characterized the atmosphere at Trace Crossings, and she believes that the issues that existed when she took over as principal had "progressively gotten better." (Doc. 21-1, p. 17). But disagreement between Ms. Litaker and Ms. Barber about the climate at Trace Crossings does not rise to the level of proof that Ms. Barber "purposeful[ly] avoid[ed] [] the truth" or "entertained serious doubts as to the truth" of her statements when she sent the November 19, 2012 email. *Harte-Hanks Commc'ns*, 491 U.S. at 688, 692.[11] Therefore, Ms. Litaker's defamation claim against Ms. Barber fails as a matter of law.

---

[11] At the summary judgment stage, viewing the evidence in the light most favorable to Ms. Litaker, the Court does not assume the truth of the statements concerning Ms. Stone, and the Court recognizes that in Ms. Litaker's annual reviews for 2010 and 2011, Ms. Barber

Because Ms. Litaker cannot prove by clear and convincing evidence that Ms. Barber acted with actual malice, Ms. Litaker may not proceed against Mr. Craig on a ratification theory. *See Jones Exp., Inc., v. Jackson*, 86 So. 3d 298, 304-05 (Ala. 2010) (an employer may "be liable for the intentional torts of its agent if the employer . . . ratified the wrongful acts," but "to prove such liability one must demonstrate, among other things, the underlying tortious conduct of an offending employee.") (internal quotation marks, citation, and emphasis omitted). Accordingly, Mr. Craig and Ms. Barber are entitled to judgment as a matter of law on Ms. Litaker's defamation claim.

## IV.    CONCLUSION

For the reasons explained above, no genuine issue of material fact exists with respect to the following claims: (1) Ms. Litaker's Title VII claim against Mr. Craig; (2) Ms. Litaker's § 1983 due process claim against Ms. Barber in her official and individual capacity; (3) Ms. Litaker's § 1983 due process claim against Mr. Craig in his official capacity; (4) Ms. Litaker's breach of contract claim against the Board; and (5) Ms. Litaker's defamation claim against Mr. Craig and Ms. Barber. Therefore, the defendants are entitled to judgment as a matter of law on these claims.

---

complimented Ms. Litaker for establishing academic and professional standards and holding members of the faculty and administration accountable for meeting those standards. While the disconnect may be persuasive with respect to some of Ms. Litaker's other claims, the reports to Ms. Barber about the situation involving Ms. Stone provide a basis for the statements in the November 19, 2012 email.

Genuine issues of material fact preclude summary judgment on Ms. Litaker's Title VII claim against the Board and her § 1983 due process claim against the Board and Mr. Craig in his individual capacity. By separate order, the Court will set these claims for a jury trial.

**DONE** and **ORDERED** this September 29, 2017.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE